POTTER HANDY LLP
Mark Potter, Esq., CA SBN 166317
Russell Handy, Esq., CA SBN 195058
Cara Townsend, Esq., CA SBN 220356
100 Pine Street, Ste 1250
San Francisco, CA 94111
Phone: (415) 534-1911
Email: ServeHT@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

**Jane Doe (ED-00028),**

Plaintiff,

v.

**G6 HOSPITALITY LLC;**
**PAVANDEV, INC.;**
**CAMBRIDGE HOSPITALITY, INC;**
**K & M ROYAL GROUP, LLC;**
**RJP INVESTMENT GROUP, INC.;**
**SANJAY PATEL, TRUSTEE OF THE RYLEN AND JASE TRUST;**
**JAYESH R PATEL**; and

DOES 1-10,

Defendants

Case No.

**Complaint for Damages:**

1. **18 U.S.C. § 1595**
2. **18 U.S.C. § 2255**

**Demand for Jury Trial**

TABLE OF CONTENTS


INTRODUCTION ........ 3

PARTIES ........ 3

JURISDICTION AND VENUE ........ 5

SEX TRAFFICKING OVERVIEW ........ 6

STATEMENT OF FACTS ........ 10

- Plaintiff was Trafficked ........ 10
- Sex Trafficking at G6 Hotels ........ 16
- Actual and Constructive Knowledge ........ 27
- G6 Franchisor and Franchisee Relationship ........ 30

FIRST CAUSE OF ACTION: TVPRA ........ 37

- Knowingly Benefited ........ 37
- Participation in a Venture ........ 38
- The Venture Violated the TVPRA. ........ 38
- Actual or Constructive Knowledge. ........ 38
- Vicarious Liability ........ 38

SECOND CAUSE OF ACTION: CAVRA ........ 39

PRAYER FOR RELIEF ........ 39

JURY DEMAND ........ 40

**PLAINTIFF'S COMPLAINT**

**INTRODUCTION**

1. Plaintiff, Jane Doe (ED-00028), files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2011 through 2015, all while Plaintiff was a young minor. For years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotel owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.

2. Plaintiff was trafficked in hotels owned, operated, and managed by defendants G6 Hospitality LLC; Pavandev, Inc.; Cambridge Hospitality, Inc; K & M Royal Group, LLC; RJP Investment Group, Inc.; Sanjay Patel, Trustee of the Rylen and Jase Trust; and Jayesh R Patel.

3. As discussed herein, the defendants derived a financial benefit from widespread use of their hotel properties for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking, these defendants continued renting hotel rooms to Plaintiff's traffickers and operated the hotels in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

**PARTIES**

4. Plaintiff is a natural person who is a resident and citizen of Kern County, California.

5. Defendant G6 HOSPITALITY, LLC ("G6 Hospitality") is a for-profit limited liability company organized under the laws of the State of Delaware, with its

principal place of business in Carrollton, Texas. G6 Hospitality is one of the largest hotel franchisors in the world and owns, operates, franchises, and/or licenses lodging facilities throughout the United States, including under the Motel 6 and Studio 6 brands. G6 Hospitality does business in a systematic and continuous manner throughout California, including within this District and Division.

6. Defendant PAVANDEV, INC. is a California corporation with its principal place of business in Walnut, CA, operated the location as a franchisee or authorized operator of Motel 6 Moreno Valley - Riverside March Air Base at 23581 Alessandro Blvd, Moreno Valley, CA 92553, during the time that the Plaintiff was trafficked.

7. Defendant CAMBRIDGE HOSPITALITY, INC. is a California corporation with its principal place of business located Cerritos, CA, operated the location as a franchisee or authorized operator of Motel 6 Ontario, CA – Convention Center-Airport at 231 N Vineyard Ave, Ontario, CA 91764, during the time that the Plaintiff was trafficked.

8. Defendant K & M ROYAL GROUP, LLC is a California limited liability company with its principal place of business Anaheim, CA, operated the facility known as Motel 6 Anaheim Hills, CA at 5710 E La Palma Avenue, Anaheim, CA 92807, as a franchisee and authorized operator of the Motel 6 brand, during the time that the Plaintiff was trafficked.

9. Defendant RJP INVESTMENT GROUP, INC. a California corporation organized and existing under the laws of the State of California, with its principal place of business located in the State of California, owned, operated, managed, controlled, and did business as Motel 6 Bell Gardens, CA - Los Angeles, a commercial hospitality lodging facility located at 6344 Eastern Ave, Bell Gardens, CA 90201.

10. Defendant SANJAY PATEL, an individual acting in his capacity as Trustee of the Rylen and Jase Trust, was and is the legal titleholder, Property Owner, lessor, and/or manager of the real property and commercial lodging establishment

operating as the Motel 6 Bell Gardens, CA - Los Angeles, located at 6344 Eastern Ave., Bell Gardens, CA 90201.

11. Defendant JAYESH R. PATEL, an individual, was and is a Property Owner, joint-venture partner, lessor, and/or co-owner of the real property and commercial lodging establishment operating as the Motel 6 Bell Gardens, CA - Los Angeles, located at 6344 Eastern Ave., Bell Gardens, CA 90201.

12. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

**JURISDICTION AND VENUE**

13. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and under CAVRA.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and a substantial part of the acts or omissions giving rise to the claims occurred in this district.

15. Further, the CAVRA cause of action permits this lawsuit to be filed in any suitable United States District Court.

## SEX TRAFFICKING OVERVIEW

16. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

17. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

18. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

19. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

20. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

21. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

22. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

23. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

24. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

25. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of

ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

26. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

27. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

28. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

29. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

30. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

31. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

32. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others, have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay—from check-in to check-out—traffickers and victims display recognizable warning signs.

33. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

34. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

35. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

36. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

37. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

38. Plaintiff's sex trafficking and commercial sexual exploitation began between approximately 2011 and 2012, when Plaintiff was approximately twelve (12)

years old. Plaintiff fled her home to escape domestic violence. Living on the streets of Southern

39. Plaintiff was advertised on online classified platforms like Backpage.com. The ads included photographs of Plaintiff in provocative clothing and suggestive poses and were effective at attracting sex buyers.

40. The Traffickers regularly transported Plaintiff to multiple locations throughout the State of California. Plaintiff was forced by the Traffickers to engage in commercial sex acts with adult men at various commercial lodging establishments, hotels, and motels. These locations included:

- Motel 6 Moreno Valley- Riverside March Air Base located at 23581 Alessandro Blvd, Moreno Valley, CA 92553
- Motel 6 Ontario, CA – Convention Center-Airport located at 231 N Vineyard Ave, Ontario, CA 91764
- Motel 6 Anaheim Hills, CA, 5710 E La Palma Ave, Anaheim, CA 92807
- Motel 6 Bell Gardens, CA - Los Angeles, 6344 Eastern Ave, Bell Gardens, CA 90201

41. These hotels, along with several others, provided the physical locations where Plaintiff's trafficking was carried out repeatedly and systematically. This continuous exploitation spanned a multi-year period beginning in approximately 2011, when plaintiff was approximately 12 to 13 years old.

42. Plaintiff wasn't the only one being trafficked by traffickers on these locations. Plaintiff was accompanied by other minors, during separate periods, including 17-year-old "K" who was subsequently arrested for trafficking Plaintiff. She was also trafficked alongside a younger victim, "C".

43. At each of these locations it was clear from inside and outside of the hotel rooms that sex for money was going on in Plaintiff's hotel room. Inside the room there was an assortment of different types of condoms for the buyers to choose from as well as quit a assortment of sex paraphernalia. Outside the room the young girls

dressed the part of a sex worker could be seen admitting a flow of older men into their hotel room, hanging out in the common areas with the other had a man in her room and no apparent supervising adult in the picture. An exception occurred during Plaintiff's stays at the Motel 6 in Moreno Valley, where the visible items were limited to condoms and lubricants. At this Moreno Valley Motel 6 Plaintiff was only 12-13 years old.

44. When housekeeping or maintenance staff would enter room, frequently while Plaintiff remained inside the room, hotel staff would see the contents and conditions of the room up close.

45. At each of these locations, Plaintiff and the other trafficking victims had several encounters with buyers daily. While one girl was with a client, the other remained in common areas.

46. When Plaintiff was approximately twelve (12) to thirteen (13) years of age, she was repeatedly brought to the Motel 6 property located at 23581 Alessandro Boulevard, Moreno Valley, California. Plaintiff recalls that guest rooms at this location open directly to the exterior, rather than onto enclosed interior hallways. Due to this open air layout, Plaintiff's movements between guest rooms, parking areas, and other parts of the property throughout the day were visible from common areas. Hotel staff and other persons present on the premises could easily observe frequent back and forth movement between rooms, vehicles, and shared spaces.

47. When Plaintiff was twelve- thirteen years old she weighed approximately 95 pounds. Her frame was small, child-like. Her trafficker instructed to wear specific clothing, including short shorts, tube tops, lingerie, swimwear, and high heeled footwear commonly referred to as "stripper heels". She remained visibly and substantially younger than eighteen years of age. When not in the room, Plaintiff would often stand outside smoking cigarettes, particularly while her companion was with a customer, and vice versa.

48. This hotel is memorable to Plaintiff as having a particularly low occupancy rate. As few as 10 rooms seemed to be occupied at any time. Plaintiff and her companion generated a far higher volume of foot traffic than the motel's overall business.

49. Adult men arrived continuously throughout the day and night. When a customer arrived, one girl would step outside the room while the other remained inside; after the customer left, the girl would return. This repetitive pattern of activity was clearly visible and would have been captured on the motel's security cameras. Given the motel's low occupancy and location in an area with little regular traffic, this highly unusual pattern was readily observable and should have immediately alerted motel personnel to the ongoing illicit exploitation.

50. Plaintiff regularly permitted housekeeping staff to enter the room. Inside, large boxes of condoms were kept on hand, and used condoms and their wrappers were frequently discarded in the trash.

51. Plaintiff interacted with hotel staff regularly. Plaintiff often requested large quantities of towels—frequently as many as six at a time, along with extra sheets and toiletries, amounts far in excess of what is typical for ordinary hotel stays. Plaintiff showered after each encounter, and staff would routinely ask for her room number when fulfilling these requests. Additionally, Plaintiff and her associates received visitors in the room, during which time they smoked marijuana and consumed alcohol.

52. While staying at this location at approximately age fourteen (14), Plaintiff was advertised and exploited online through the website humaniplex.com.

53. Plaintiff also recalls that this location was the site of a law enforcement incident involving one of the adults who had been transporting and controlling her during this period.

54. At the time of her trafficking, Plaintiff was afraid, dependent, and unable to escape her circumstances. Due to her young age and lack of stable support system, Plaintiff had no realistic means to seek help or safely leave the environment.

55. Based on the motel's open-air design, low occupancy, and the repeated observable events - including the presence of visibly young girls, extended stays without parental supervision, the constant arrival and departure of unfamiliar adult men, frequent requests for supplies, and clear signs of commercial sexual activity, hotel personnel and management knew or should have known that unlawful activity was taking place, specifically the trafficking and sexual exploitation of a minor. Despite these clear red flags, no action was taken to investigate, intervene, or report the activity.

56. Plaintiff was subsequently held and exploited at the Motel 6 location situated at 231 N Vineyard Ave, Ontario, CA 91764. Plaintiff was trafficked at this property less frequently than at other locations, with individual stays lasting approximately one to three days at a time, occurring at least four times per year throughout the period of her exploitation.

57. Concurrently, during this same time period, Plaintiff also stayed at the Motel 6 property at 5710 E La Palma Avenue, Anaheim, CA 92807. Plaintiff was trafficking out of this location during approximately five different bookings, with stays ranging from 3 to 6 days. Plaintiff, appearing visibly young, was seen moving about the property at all hours, arriving in different vehicles, and present outside as late as 2:00 or 3:00 a.m. This activity was observable to staff, yet no action was taken.

58. The routine was the same at Bell Garden Motel 6 property at 6344 Eastern Avenue, Bell Gardens, CA 90201. Frequent arrivals and departures of adult men, evidence of commercial sexual activity in the room, and regular contact with housekeeping staff. Plaintiff stayed at this location approximately seven times each year, for an average of 1-3 days each time.

59. The Traffickers subjected Plaintiff to extreme physical violence, psychological coercion, and systematic abuse. Plaintiff was severely physically assaulted by the Traffickers. These assaults included being choked, being thrown against walls, broken bones, and beating in which she lost consciousness.

60. Plaintiff was repeatedly sexually assaulted by both her Traffickers and buyers.

61. The Traffickers supplied plaintiff with drugs, including, ecstasy, marijuana, and cocaine, further facilitating control and dependency.

62. As a direct and proximate result of being trafficked and subsequently abused in institutional placements, Plaintiff has suffered severe and ongoing physical, psychological, and emotional harm.

63. Plaintiff suffers from profound, chronic, and debilitating psychological injuries. These conditions include extreme anxiety, clinical depression, and severe trauma-related symptoms consistent with Post-Traumatic Stress Disorder (PTSD).

64. Plaintiff's psychological trauma routinely manifests in severe physical illnesses. These physical manifestations include uncontrollable shaking, rapid heart rate, sweating, severe gastrointestinal distress, and prolonged, vomiting requiring medical care.

65. Plaintiff has required ongoing mental health treatment, including therapy, psychiatric care, and multiple emergency room visits. She has incurred significant out-of-pocket medical expenses, including emergency treatment costs.

66. Plaintiff’s trauma has significantly impacted her ability to work, maintain relationships, and function in daily life. She has experienced periods of disability, loss of employment opportunities, and difficulty performing basic tasks.

67. Plaintiff’s relationships with her spouse, children, and extended family have been deeply affected. She experiences emotional instability, conflict, and isolation as a result of her trauma.

68. Plaintiff continues to suffer long-term and ongoing harm as a result of her trafficking, including lasting psychological trauma, impaired functioning, and diminished quality of life.

69. The commercial sexual exploitation of Plaintiff was facilitated by online platforms such as Backpage, which enabled traffickers to advertise her as a minor and connect with buyers, generating profit from her exploitation

70. Plaintiff's trafficking, abuse, and resulting damages were foreseeable and preventable, yet were allowed to continue due to the actions and inactions of those who facilitated and ignored clear indicators of exploitation.

**Sex Trafficking at G6 Hotels**

71. G6's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Plaintiff's trafficking that sex trafficking was ongoing and widespread at G6 properties.

72. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[1]

73. Public statements of G6 confirm that they knew that sex trafficking is a problem and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that traffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[2] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels."[3]

74. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online

---

[1] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility

[2] G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[3] *Id*.

reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

a. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day. [4]

b. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio. [5]

c. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex. [6]

d. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois. [7]

e. In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA. [8]

f. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon. [9]

---

[4] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door*, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105

[5] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/

[6] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[7] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download

[8] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html

[9] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims

g. The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama. [10]

h. The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California. [11]

i. In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[12]

j. Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland. [13]

k. In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women. [14]

l. Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota. [15]

[10] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[11] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[12] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity

[13] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen

[14] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html

[15] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

m. In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity. [16]

n. In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida. [17]

o. A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada. [18]

p. In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island. [19]

q. A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington. [20]

r. In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape. [21]

---

[16] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel, KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172

[17] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html

[18] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/

[19] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html

[20] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/. https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[21]https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html

75. These articles represent only a limited and non-exhaustive sample. Numerous additional reports document sex trafficking and related criminal activity at G6-branded hotels. Moreover, upon information and belief, the G6 Defendants are aware of substantial additional law enforcement activity involving trafficking at their properties that was not reported in the media. In total, state and federal law enforcement agencies have prosecuted several hundred traffickers, involving hundreds of victims, for sex trafficking and forced prostitution conducted at G6-branded properties

76. Online reviews of the Motel 6 located at 23581 Alessandro Blvd, Moreno Valley, CA:

a. In 2017, a customer posted an online review of Motel 6 Moreno Valley - Riverside March Air Base on TripAdvisor, "I had tho stay here one time and my experience was horrible. My wife checked into the room and when I got off work I went to the room and couldn't open the door so the manager came up and was extremely rude. Seen I had a cat and demanded a $10 extra fee. I walked into the room and it was so dirty and disgusting. There was burn marks from crack pipes or something else all over and the bed was so dirty I told my wife to leave and put our stuff back in the car too go to another place. I didn't even stay there 5 minutes and they would not give my money back. Stay away from this place drugs and hookers all over the place

b. In 2023, a customer posted an online review of Motel 6 Moreno Valley - Riverside March Air Base on Google, "In Moreno valley this place is called hooked hang out I was there because of a flat tire"

77. Online reviews of the Motel 6 located at 231 N Vineyard Ave, Ontario, CA 91764:

a. In 2012, a customer posted an online review of Motel 6 Motel 6 Ontario, CA – Convention Center Airport on TripAdvisor, "...unless you are

looking for hookers or drugs. Rooms are nasty. Staff is inattentive. Security is non-existent - he runs and hides when help is needed. Of course, the local police are here all the time. Have to wonder why!”.

b. In 2014, a customer posted an online review of Motel 6 Motel 6 Ontario, CA – Convention Center-Airport on Yelp, “I read the other reviews of this Motel 6 and I could not believe the lies. I would not only NOT recommend this motel, I would strongly suggest you stay next door at the Best Western - the prices are the same - and there is a world of difference. If you like drug dealers, prostitutes and constant police activity, if having your water turned off on a daily basis without notification (and it isn't an emergency situation) is fun for you, if you enjoy black mold in your bathroom and leaking air conditioning, by all means, please stay at this motel. On the bright side, most of the office staff are friendly, polite and helpful. Management, (Pam - Mgr) is not. Please don't ask the cleaning staff for anything unless you are bilingual (english/spanish), because they will only look at you as if you are from another planet. And the finishing touch was the sign on the gates to the swimming pool - I kid you not, it says, " If you have had explosive diarrhea in the last week please do not use the pool". I can only imagine.”

c. In 2018, a customer posted an online review of Motel 6 Motel 6 Ontario, CA – Convention Center- Airport on Google, “The walls of this hotel are very thin and I could hear everything in the room next door. Everything..... I'm pretty sure there was a prostitute in the room next door because I could hear all the sex that was going on. But I kept hearing different men's voices so I'm pretty sure it was a prostitute. Just be ready to hear everything.”

d. In 2018, a customer posted an online review of Motel 6 Motel 6 Ontario, CA – Convention Center- Airport on Google, “What can I say? The rooms are ultra cheap. Yet, somehow, this hotel avoids the ultra low of society

who might have come here for the cheap rate? It must be that it is on a somewhat main street. Other nearby hotels, off of the main drag, with slightly higher rates, get all of the bad ombres. Not saying you'll be housed with the royals, you certainly won't be, but you also don't have to deal with pimps and hookers."

e. In 2018, a customer posted an online review of Motel 6 Motel 6 Ontario, CA – Convention Center- Airport on Google, "Its a motel 6 a couple drugies digging in the ash tray a prostitute here and there with resonable pricing lol jk... Really though its a nicer motel 6 I guess you can say. Like I said it has ash trays for your cigs and I heard through the grape vine that they only change the whites on the beds after each guess but the comforters only get changed every I don't know barely ever I don't know about you but I think that's pretty freaking disgusting . I thought most people do their dirty biz on top of the bed comforter and sleep under the sheets maybe that's just me I can't really speak for everyone else. Just myself so maybe I'll make sure they wash it after I stay there LOL. Make sure and just be careful and bring your own comforter. because I don't know about you but I don't want to sleep with another man or woman's jiz right over myself. I mean I understand trying to conserve water blah blah blah. no I can't not for this instance waste the water use as much water as you need and wash the f****** comforters after every guess, please you know am I right? alright hopefully I hope I have helped you with my review. PS. And that is not just as Motel 6 that is most of them are here and a lot of the other cheapies motels / hotels... the location is killer though right next to the 10 freeway really close to the 15 and 210 freeways is literally next door to the airport it's quite a few fast food joints around there about a hundred other hotels some places you can sit down and have a good meal really in the middle between the mountains and the beach couple miles away from the Ontario

Mills and the Victoria Gardens and the Montclair Plaza there is guasti Park also which is really close you can go there and spend the night stay at a big park and go fishing and enjoy the sights as a very very nice view of the mountains and when it snows so beautiful you can see the whole thing the weather there typical Cali weather amazing sometimes a little hot but mainly amazing and the nights can be a little cold but not freezing the motel also has a swimming pool there is a place near the Ontario Mills that you can go mock skydiving that the little go-kart racing track right next to that indoor rock climbing a little bit it up the street from both of us all right off the freeway super killer location once again hopeless helped"

f. In 2021, a customer posted an online review of Motel 6 Motel 6 Ontario, CA – Convention Center- Airport on Google, "It was okay outside of the hotel but when you got my room there was mode in the shower like the housekeeping didn't really do her job. (Disappointed) that's the first thing pillowcases had hairs stuck to it disgusting. Then people next door was smoking coming through the bathroom vent. And people doing drug deals outside of the hotel. I have to check out the next day I just couldn't take that anymore..it was too much."

78. Online reviews of the Motel 6 located at 5710 E La Palma Ave, Anaheim, CA 92807:

a. In 2013, a customer posted an online review of Motel 6 Anaheim Hills, CA on Yelp, "First off let me say...this place is GHETTO...I only stayed here because my house was having some construction done on it..I live down the street. This place smells bedding is nasty..stains of what origin..don't know..eww and yuck.I moved my room three times to get a room that didn't smell and didn't have body fluids on the comforter.I'm thinking of CSI and that little blue light.I was gonna take a picture but decided not to but trust me I wouldn't let my dogs stay here.You would think for the area that it

would be a decent place..motel 6 is probably a better choice for a short term stay. Usually when my house is having work done I stay at marriot's fairfeild inn behind fox fire which is clean ,nice rooms are nice great decore,jacuzzi tubs,free breakfast..I should write a review for that place anyway..don't stay at. Anaheim hills inn EVER! Not even for a quickie...lol its ghetto fabulous! Hookers and pimps fabulous..lol no stars for this place. Only plus about this place is in-n-out is across the street. Get some in-n-out and get yo ass to fairfield inn instead! ..lol"

b. In 2015, a customer posted an online review of Motel 6 Anaheim Hills, CA on Yelp, "This place is DISGUSTING. We checked in and there was a family requesting security footage because some of their belongings had been stolen out of their room. The hallways are dinghy and dark, and the rooms are worse. The walls in the room had something dripping down them. The bedding was stained and old, pillows were lumpy. There was black mold in the bathroom and the towels were worn and had holes. There were also black spiders in our room. I didn't stay here, I left immediately and slept on a relatives couch instead. When I was waiting for my ride in the front area, there were two hookers in the lobby. DO NOT STAY HERE."

c. In 2019, a customer posted an online review of Motel 6 Anaheim Hills, CA on Yelp, "I wish I can give this motel zero stars. This was the most disgusting place I have ever visited. I told the male receptionist, who was rude and smelled of cigarettes, that the hotel belongs on Hotel Hell. I was so disappointed to see the obvious prostitution happening around the hotel. I am very sure that my safety was at risk. I got my refund immediately at seeing the crap room."

d. In 2022, a customer posted an online review of Motel 6 Anaheim Hills, CA on Kayak, "It was misrepresented. The pictures show a newly renovated

room, they were not. It was absolutely disgusting. The room was dirty, the carpet and wallpaper were stained and peeling. The room smelled like smoke even though it was non smoking. The sheets had burns on them. The room was just nasty. We witnessed a drug deal upon arriving back to our room one of the nights. There were people loitering and digging through the trash every night and on our last night we were woken by the sound of gun shots."

e. In 2022, a customer posted an online review of Motel 6 Anaheim Hills, CA on Google, "First thing me and my family find after being told the room was just cleaned is a crack pipe not just that the room was horrible holes and tears on the walls and destroyed bed frame would NEVER recommend anyone too take you're family to one of these unless you don't mind being next to crackeads prostitues hear screams and smell weed all day long"

f. In 2024, a customer posted an online review of Motel 6 Anaheim Hills, CA on Yelp, "DON'T STAY HERE! They advertise as a Motel 6, but it's not a Motel 6, much worse. Unless you're a prostitute looking to make a couple of bucks, or trying to score some drugs. Area around the hotel is not safe, be ready to defend yourself. First room was bad, refrigerator door was bent with a broken seal and dripping water, toilet kept on running. Second room was worse, carpet was crunchy and spotted with stains, phone was not connected, sheets made you itchy and we have dry throats now. We were afraid to ask for a third room, should have left. Do yourself a favor, stay someplace else.

79. Online reviews of Motel 6 located at 6344 Eastern Ave, Bell Gardens, CA:

a. In 2007, a customer posted an online review of Motel 6 Bell Gardens, CA - Los Angeles on TripAdvisor, "We booked this hotel during the WPT events in LA and boy was that a mistake. I checked out in less than an hour

of being there. It was gross, looked like a rundown sex motel. The bathrooms were dirty. Table, bed, coffee maker ewwwwwwww, disgusting. DON'T DO IT!!! Read the other reviews. They've also had bad experiences. I initially booked four days of stay but as soon as we entered the room, we checked right back out. The management still charged us for one night of stay which we did not stay. They were money hungry rip off management trying to make a dollar anyway they could. Extremely rude, and would not give us a refund. I was not happy because their webpage said there was a shuttle but there was none. As I was discussing this with the management, they brought up an incident where a man and a hooker almost burned down their hotel with a cigarette in front of my family and younger siblings. I was furious. The management had an extremely bad attitude. How could they expect us to stay there after telling us that! The management had an extremely bad attitude. You will feel like you're gonna catch a disease. Rude! Nasty! Dirty! Rip Off!"

b. In 2017, a customer posted an online review of Motel 6 Bell Gardens, CA - Los Angeles on Google, "Thr people who work here do the good reviews. Look in the news on the area . Don't believe the other reviews THERE ARE BLOOD STAINS SEE PICTURES BED BUGS , blood stains and cops, shootings and prostitution. Take your money else where. Mark is a creepy and I believe he followed us from the hotel."

c. In 2020, a customer posted an online review of Motel 6 Bell Gardens, CA - Los Angeles on Google, "Good service but too many crack heads"

80. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Plaintiff was trafficked at this Motel 6 hotel, G6 knew or should have known:

a. The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

c. G6 franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

81. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**Actual and Constructive Knowledge**

82. At all relevant times, the defendants knew or should have known that sex trafficking was prevalent at their hotels because the trafficking occurred openly on these premises, followed well-established patterns, and presented with obvious indicators that Defendants recognized and acknowledged as signs of sex trafficking in a hotel environment.

83. Upon information and belief, Plaintiff's trafficker, along with other traffickers, repeatedly selected these locations to conduct sex trafficking activities because their policies and practices created a favorable environment for trafficking and because hotel staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with minimal effort to conceal their activities, based on an implicit understanding that their conduct would not be questioned or disrupted by the hotels.

84. Moreover, numerous trafficking "red flags" were observed by hotel staff and management at both locations. These indicators included, among others, payment in cash or prepaid cards; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and other conduct consistent with the well-established indicators of sex trafficking described above.

85. During the period that Plaintiff was trafficked, there were obvious signs that her trafficker was engaged in sex trafficking:

- Plaintiff would have few or no personal items when checking in.
- Plaintiff or her minor companion could be seen loitering on the property in sex worker attire while the other was with a grown man in the hotel room.
- Plaintiff had heavy foot traffic of non-hotel guests who were all older men coming to the room occupied by these young girls who were dressed like sex workers.
- After Plaintiff checked out, the hotel cleaning staff noticed large amounts of used sex paraphernalia, like condoms and lubricant, in the trash.
- Frequent request for extra towels, sheets, and toiletries.

86. Other obvious signs of trafficking consistent with the modus operandi of her trafficker, which included well-known "red flags" for trafficking in a hotel.

87. Employees at these hotels, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

88. As such, the defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject hotels.

89. Given these obvious signs, defendants knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff.

90. The defendants also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject hotels.

91. If the defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject properties.

92. The hotel staff and the franchisees also facilitated the trafficking of Plaintiff at the property, on information and belief:

a. continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" and knowledge of trafficking of Plaintiff and other victims;

b. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

c. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities, but, instead, could operate without concern for detection or interference by the hotel staff;

e. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

93. The defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

94. The defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**G6 Franchisor and Franchisee Relationship**

95. G6 is a franchisor of the Motel 6 brand, and Defendants Pavandev, Inc., Cambridge Hospitality, Inc, K & M Royal Group, LLC, RJP Investment Group, Inc., Sanjay Patel (Trustee Of The Rylen And Jase Trust), and Jayesh R Patel operated as its franchisees. The commercial properties associated with these franchise agreements are the Motel 6 locations at 23581 Alessandro Blvd (Moreno Valley), 231 N. Vineyard Ave (Ontario), 5710 E La Palma Ave (Anaheim) and 6344 Eastern Ave. (Bell Gardens).

96. It is a standard practice in the hospitality industry, followed by Defendants, for Franchisors to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where, and how guests should be greeted.

97. Franchisors provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

98. Defendants provide their branded properties, branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled by the G6 for its Motel 6 locations.

Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.

99. Upon information and belief, G6 requires its branded hotel properties to use a property management system, which is linked to its corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

100. Upon information and belief, per the relevant franchise agreements, G6 may enforce its brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

101. It is further a standard practice in the hospitality industry, and therefore, upon information and belief, G6 exercises significant control over the employment decisions of their hotel locations, including the Motel 6 properties at 23581 Alessandro Blvd (Moreno Valley), 231 N. Vineyard Ave (Ontario), 5710 E La Palma Ave (Anaheim) and 6344 Eastern Ave. (Bell Gardens).

102. G6 has promulgated policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel location where Plaintiff was trafficked.

103. Under federal labor regulations, G6, Pavandev, Inc., Cambridge Hospitality, Inc, K & M Royal Group, LLC, RJP Investment Group, Inc., Sanjay Patel (Trustee Of The Rylen And Jase Trust), and Jayesh R Patel each acted as joint employers of the employees working at the following Motel 6 locations: 23581 Alessandro Blvd (Moreno Valley), 231 N. Vineyard Ave (Ontario), 5710 E La Palma Ave (Anaheim) and 6344 Eastern Ave. (Bell Gardens).

104. G6 exercised day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over the Motel 6 properties located at 23581 Alessandro Blvd (Moreno Valley), 231 N. Vineyard Ave

(Ontario), 5710 E La Palma Ave (Anaheim) and 6344 Eastern Ave. (Bell Gardens) where Plaintiff was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

105. Upon information and belief, G6 controlled the operations of the Motel 6 properties in Motel 6 properties located at 23581 Alessandro Blvd (Moreno Valley), 231 N. Vineyard Ave (Ontario), 5710 E La Palma Ave (Anaheim).and 6344 Eastern Ave. (Bell Gardens), through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring all Franchisees to use G6's centralized property management, data management, and reservation and billing systems;

b. Gathering reports of data generated by Franchisees, including guest information, reservations, payment, and occupancy information through G6's centralized systems;

c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

d. Requiring all Franchisees to purchase products through G6's e-procurement marketplace system or from approved suppliers;

e. Requiring all Franchisees to pay fees based of the percentage of gross room revenues;

f. Providing advertising requirements and standardized marketing services;

g. Requiring all Franchisees to use approved vendors for internet services or other requirements for cybersecurity and technology;

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies across the Franchisees' operations, including training and orientation materials for staff;

j. Requiring all Franchisees to make modifications upon G6's request and to refrain from making substantial changes without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.

106. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand-related policies published and communicated via property management systems with back-end management by G6.

107. G6 controls uniform and required reservation, marketing, customer support systems, and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.

108. G6 requires all Franchisees to use a centralized, cloud-based reservation and property management system.

109. G6 gathers data from its customers, including names, payment information, reservation history, browsing data, and other details associated with their stay, for promotional and guest safety reasons.

110. G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, which gives G6 the ability to access, monitor, and harvest that internet data.

111. G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.

112. G6 participated directly in aspects of the operation of the subject Motel 6 that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Plaintiff as follows:

a. The G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6, including design and implementation of practices to prevent trafficking, safety and security

procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

b. The G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels.

c. The G6 Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6 Defendants. The G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

d. The G6 Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

e. The G6 Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking.

f. The G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

g. Although they delayed making any reasonable effort to do so, the G6 Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity.

h. The G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and

responding to potential criminal incidents at all Motel 6 and Studio 6 properties, including suspected trafficking incidents.

i. The G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Motel 6.

j. The G6 Defendants maintained control over all details of the terms under which franchised hotels, including the subject Motel 6, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Motel 6.

k. The G6 Defendants retained control over the setting, supervision, oversight, and enforcement of detailed policies and protocol for housekeeping services at the Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

l. The G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Motel 6, including trends that would reveal patterns consistent with human trafficking.

113. G6 played a central role in renting rooms at the subject Motel 6 by, among other things:

a. The G6 Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b. The G6 Defendants directly made reservations for rooms at the Motel 6 and accepted payment for those rooms through a central reservation system that they controlled and operated. The G6 Defendants could reserve rooms and accept payments without requiring Franchisee approval or involvement.

c. The G6 Defendants established and maintained control over a brand-wide "do not rent" system. The G6 Defendants set all policies related to the use of this system and dictated the day-to-day details of reservations at the Motel 6 through detailed policies that it established regarding the use of this "do not rent" system.

d. The G6 Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

e. The G6 Defendants controlled and restricted the ability of franchisees and staff to refuse or cancel a reservation.

f. The G6 Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures.

g. The G6 Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Motel 6.

h. The G6 Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Motel 6. until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room, and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i. The G6 Defendants required franchisees to use G6's property management system, which was owned, maintained, controlled, and operated by the G6

Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

114. The G6 Defendants oversaw the do-not-rent (DNR) lists for their branded properties.

**FIRST CAUSE OF ACTION: TVPRA**

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

115. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

116. Thus, the federal sex trafficking statute consists of four elements: (a) the defendant knowingly benefited, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant knew or should have known the venture violated the statute.

**Claim 1: G6, Pavandev, Inc., Cambridge Hospitality, Inc., K & M Royal Group, LLC, RJP Investment Group, Inc., Sanjay Patel, Trustee of the Rylen and Jase Trust, and Jayesh R. Patel Liability**

**Knowingly Benefited**

117. G6, Pavandev, Inc., Cambridge Hospitality, Inc., K & M Royal Group, LLC, RJP Investment Group, Inc, Sanjay Patel (Trustee of The Rylen and Jase Trust) and Jayesh R Patel benefited financially from the rental of the rooms where the violations of the TVPRA occurred.

**Participation in a Venture**

118. G6, Pavandev, Inc., Cambridge Hospitality, Inc., K & M Royal Group, LLC, RJP Investment Group, Inc, Sanjay Patel (Trustee of The Rylen and Jase Trust) and Jayesh R Patel fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

119. Moreover, the G6 defendants were involved in a business venture with Pavandev, Inc., Cambridge Hospitality, Inc, K & M Royal Group, LLC, RJP Investment Group, Inc, Sanjay Patel (Trustee of The Rylen and Jase Trust) and Jayesh R Patel to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

120. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

121. Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

122. The G6 Defendants exercise of day-to-day control over the Motel 6 properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control

over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

**SECOND CAUSE OF ACTION: CAVRA**

Child Abuse Victims Rights Act ("CAVRA")

18 U.S.C. § 2255 (against all defendants)

123. Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

124. Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

125. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post- judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

POTTER HANDY LLP

Dated: July 21, 2026 By: /s/ Mark Potter

Mark Potter
Attorneys for Plaintiff